In re Joshua Muhammad, No. S0185-08 CnC (Toor, J., Apr. 28, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
CHITTENDEN COUNTY

| | |
|---|---|
| In re JOSHUA MUHAMMAD | SUPERIOR COURT<br>Docket No. S0185-08 CnC |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This is a post-conviction relief case in which petitioner Muhammad alleges ineffective assistance of counsel at his criminal trial in 2005. A contested merits hearing was held on March 18, 2010. Muhammad was represented by Seth Lipschutz, Esq.; the State was represented by Andrew Strauss, Esq.

Findings of Fact

In 2004, Muhammad was charged with sale of cocaine. He went to trial in 2005, represented by Harley Brown III, Esq., and was found guilty by the jury. He appealed, and his conviction was affirmed by the Vermont Supreme Court in 2007. His appeal was based upon claims that (1) the trial court should have granted a motion to dismiss, and (2) the trial court should not have ruled that certain evidence was admissible as a result of defense counsel "opening the door" to it.

The Court rejected both arguments. First, it rejected Muhammad's claims that suppression of unauthorized electronic monitoring evidence mandated dismissal of the entire case. The Court held that "the trial court properly suppressed the recording as well as evidence derived from the use of the electronic monitoring device." Vermont v. Muhammad, 2007 VT 36, ¶ 7. It affirmed the use of the informant's testimony as distinct from the monitoring rather than "fruit of the poisonous tree." Id. ¶¶ 7-8.

As to the issue of "door opening," the Court agreed that it was appropriate to allow "evidence of defendant's other drug-related activity and his involvement in an assault." Id. ¶ 9. It is this door-opening that is the basis for Muhammad's present claim of ineffective assistance of trial counsel.

The Vermont Supreme Court explained that the trial court "allowed the State to introduce evidence of defendant's involvement in another drug transaction … and a later assault, only after defense counsel opened the door to its introduction." Id. The Court explained:

> Specifically, defense counsel cross-examined the DEA officer about his knowledge of defendant prior to the controlled buy, implying that the officer had no information connecting defendant to drug activity at the time he began his investigation of defendant. Furthermore, the defense questioned the officer about surveillance of defendant's home that took place between late January and March 4, suggesting that because the DEA officers did not gather enough evidence against defendant for a search warrant or arrest during that period, there was no evidence linking defendant to drug sales. Finally, the defense asked the officer about a search of defendant's home and car on April 18, more than a month after the date of the controlled buy. This prompted the officer to respond that nothing linking defendant to drugs was found during the search.

Id.¶ 9. As a result of these questions by defense counsel, the Court explained, the trial judge allowed the prosecutor on redirect to inquire into areas he had not addressed on direct:

> The trial court allowed the State to introduce testimony about defendant's March 24 drug activity to rebut the inference created by defense counsel that the officers had no reason to suspect defendant other than some bias against him. Likewise, the court allowed testimony that the April 18 search was pursuant to an assault charge, to counter the suggestion that the officers were merely on a fishing expedition for drug-related evidence and ultimately found nothing. The trial court was entitled to use its discretion in

2

> admitting the evidence under Rule 404(b), not to show a propensity for criminality, but to correct the misimpression of bias created by the defense.

Id.

Specifically, what defense counsel asked included the following. He first asked the police officer whether he had any information that Muhammad had a drug problem. Trial Transcript, p. 38. The officer said no. After getting the officer to concede that he did not see the transaction take place, counsel asked "the focus of your attention was on Ms. Desautels [Muhammad's girlfriend], was it not?" The answer to that questions was "no." Id. p. 41. On redirect, the prosecutor then asked "since Mr. Brown raised the question, what is it that led you to be focusing on Mr. Muhammad?" Id. p. 42. Attorney Brown objected, and Judge Kupersmith overruled the objection, stating "You opened the door, Counsel." Id. pp. 42-3. The officer then said that the police "had information from another confidential informant that Mr. Muhammad had been in the area for approximately a month, was living with Ms. Desautels and was selling cocaine as well as heroin …" Id. p. 43.

The prosecutor went no further at that point. However, Attorney Brown then asked additional questions on re-cross. He first asked some questions that led to a bench conference at which it became clear that there were additional DEA reports about the other CI, reports that Attorney Brown did not recall seeing. It was unclear whether he had been provided the reports in discovery or not: the prosecutor asserted that he had, and Attorney Brown neither agreed nor disagreed but merely said that he was "not aware of any other informant." Id. pp. 44-5. Attorney Brown then asked whether the other informant had made any controlled buys. The officer said he had not. Id. p. 45. Attorney Brown then said "none of that stuff he told you was ever substantiated until you sent

3

somebody in on March 4ᵗʰ?" and the officer responded that prior to March 4, the police "did surveillance and monitored activity that was consistent with people selling drugs from their residence." Id.

Brown then moved on to establishing that no drugs were found when a search of the residence and the car were done on some other occasion (apparently on April 18, weeks after the incident at issue, but the jury was not told that). The officer agreed that no drugs were found in the house, but added that the State alleges that there was crack cocaine in the car. Id. pp. 46-7. A bench conference ensued, a good deal of which was unintelligible to the transcriber. Id. at 47-9. Brown raised the issue that this search was after March 4, but the prosecutor pointed out that Brown raised the post-March 4 conduct by asking about the April search. The court ruled again that Brown had opened the door to this information. Id.

The prosecutor then asked what was seen during the surveillance, and the officer explained the short-term repeat traffic of visitors to the house. Id. p. 49. He also described following Muhammad and Desautels to New York City, and the fact that it was a violation of Desautels' "conditions" – though whether the jury had any idea what that meant is questionable. Id. pp. 49-50. The prosecutor then asked about the April 18 search, specifying the date, and the officer explained that it was in connection with "an assault" as opposed to a drug investigation. Id. p. 50. The prosecutor then said "Mr. Brown also …. suggested during that period you had no evidence, that is the period from March 4ᵗʰ to April 18ᵗʰ when this – that the defendant was engaged in drug activity. Do you remember that?" Id. pp. 50-1. He then asked about an "aborted transaction" involving Muhammad and an undercover officer. Id. p. 51. Attorney Brown objected to

4

the details of the transaction being described, saying his questions had been directed only at whether money or drugs had changed hands, and none did on April 18 either. He was overruled. Id. p. 53.

The officer then explained that another detective had spoken to Muhammad and they had set up a deal to purchase crack cocaine on March 23. He described the monitored undercover setup and the fact that it went as far as a meeting at which Muhammad said he could sell ten to twelve grams of crack cocaine, a price was negotiated, and the deal only fell through because Muhammad became suspicious that the detective was with the police. Id. pp. 53-7. Attorney Brown then asked "Mr. Muhammad wasn't arrested, was he?" to which the officer responded "At that point, no, sir, he was not." He was then asked if Muhammad was searched and said he was not. He also conceded he did not know whether Muhammad had "anything on him" at the time. Id. p. 58.

In response to that last questioning, the prosecutor then said "Mr. Brown suggested that there were no charges as a result of this" and Brown objected, saying he had only asked whether Muhammad was arrested. The court overruled the objection, and the officer answered "[t]here are current pending charges in this court for I believe it's attempted sale of cocaine." Id. pp. 59-60.

What Muhammad argues in this proceeding is that the questions asked of the police officer by defense counsel constituted ineffective assistance because a reasonably competent defense lawyer would have seen the likely door opening before he walked down that path. In support of this claim, Muhammad presented the testimony of Robert Katims, a criminal defense attorney in Burlington.

Attorney Katims has been practicing law for twenty-two years, the last ten of those almost exclusively doing criminal defense. He has a private practice and also has done contract work for the Defender General. He currently has such a contract as one of the Serious Felony Unit attorneys, which involves homicides and cases involving potential life sentences. He has testified only once before in a post-conviction relief case, but has consulted on several others.

Attorney Katims reviewed the trial transcript in this case, as well as other relevant records. He agrees that trial counsel in this case did a good job on a number of issues, including (1) avoiding joinder of the two drug charges, (2) successfully winning suppression of the electronic monitoring evidence, (3) showing the jury the potential bias of the CI (who was receiving a benefit from the government in exchange for testifying), and (4) establishing that the CI's deposition testimony was inconsistent with her trial testimony with regard to whether Muhammad or his girlfriend actually took the buy money and delivered the cocaine.

However, Attorney Katims opined that it was a "devastating" mistake for trial counsel to ask broad questions about whether the police had *any* evidence that Muhammad was selling drugs, because that opened the door for the State to present the evidence it did have: (1) that another CI had reported Muhammad was selling drugs, and that those drugs included not just cocaine but heroin, (2) that Muhammad had been followed to New York by the police, and that it was a violation of his girlfriend's conditions of release, (3) that another cocaine buy had been arranged through an undercover police officer, which ended only because Muhammad became suspicious that the buyer was a police officer, (4) that Muhammad's home had been monitored and what

6

appeared to be other drug traffic had been seen, and (5) that there was another cocaine charge pending against Muhammad.

Trial counsel testified that he did not expect his questioning to open the door to any of this evidence. He explained that because the other incidents were later in time, he did not think they would come into evidence. He also said with respect to the strength of the State's case, "I thought we were in trouble" because the State had a confidential informant "who'd made a controlled purchase" and her story would be corroborated by the police saying that she went into the building without drugs and came out with drugs. Thus, he felt it would be a difficult case to win. His strategy was to blame it all on the girlfriend and minimize Muhammad's involvement. Brown was trying to show that it was the girlfriend's apartment, and that the police were targeting Muhammad. He tried to make the point that the police searched him, his car, and the apartment, and never found any drugs. However, he said, his strategy backfired.

Brown acknowledged that he was aware of the other undercover, attempted sale and was not trying or expecting to "open the door to that case." He said that Muhammad may have pushed him to raise the issue of no drugs having been found in the house or the car.

Attorney Katims disagreed with Attorney Brown with regard to the strength of the case. He saw the case as a weak one for the State given the CI's potential bias, the fact that she was a drug addict herself, the fact that in her deposition she said she gave the money to and received the drugs from Muhammad's girlfriend rather than him, and the suppression of the tape that could have corroborated the CI's story. The entire case rested on the CI's story, and that story was one that defense counsel could punch holes in.

Thus, Katims was of the opinion that if defense counsel had not opened the door to evidence of other drug involvement, there was a reasonable probability that Muhammad would have been acquitted.

In addition, Katims opined that any reasonably competent defense attorney would have known the evidence was out there, would have understood that it could be devastating to the client, and would have done everything in his power to keep the evidence out at trial – perhaps even to the point of not cross-examining the police officer at all. Asking the question "you were not focusing on him, were you?" without knowing the answer was a serious mistake.

Another issue brought out at the hearing had to do with whether or not trial counsel had reviewed all of the State's discovery. The trial transcript reflects that Attorney Brown asked the police officer what happened to the other CI he mentioned, and then said "that wasn't in your report, was it," to which the officer replied that it might be in another report. The prosecutor then asked to approach the bench and the parties discussed the fact that there were several DEA reports. Transcript, pp. 43-45. Attorney Simpson asserted that he had given Attorney Brown all the reports, which referred to different CIs by number, and Attorney Brown asserted "I'm not aware of any other informant." Id. p. 44. There was further comment by each attorney about "what was provided in discovery" but it is recorded as mostly "inaudible" in the trial transcript.

Defense counsel testified at the hearing that he did not recall whether he was even given the discovery by the State. Attorney Katims testified that regardless of whether it was in his possession, the full file is available at the State's Attorneys' office for review and counsel should have looked at it. Katims believed that defense counsel had not

reviewed the file, because he appeared at trial to be unaware of the other surveillance that had been done on Muhammad.

The State pointed out at the hearing that the charge against Muhammad was brought as an accessory charge, so that it was a reasonable strategy to try to show that Muhammad was not involved in a scheme to sell drugs. The CI did acknowledge on cross-examination by defense counsel that she did not know Muhammad, and that it was his girlfriend she had contacted to purchase drugs. However, Attorney Katims pointed out that the broad questions asked went way beyond whether Muhammad was part of the sale on March 4, and that "there is no [defense] strategy that justifies these questions."

The State also suggested that the evidence that came in after the defense attorney's questioning related to events that occurred later in time than the cocaine charge itself, suggesting that defense counsel had good reason to think it would not be admissible. However, Attorney Katims pointed out that the surveillance occurred prior to the sale at issue.

### Conclusions of Law

When seeking post-conviction relief on the basis of a claim of ineffective assistance of counsel, the petitioner must prove two things:

> Petitioner must show by a preponderance of the evidence that (1) his counsels' performance fell below an objective standard of performance informed by prevailing professional norms; and (2) there is a reasonable probability that, but for counsels' unprofessional errors, the proceedings against him would have turned out differently.

In re Plante, 171 Vt. 310, 313 (2000). "The first prong of this test is an inquiry into the 'reasonable competence [of the lawyer] as measured by the prevailing standards in the conduct of the defendant's case.'" In re Russo, 2010 VT 16, ¶ 16. "In making this

showing, petitioner must first overcome the strong presumption that counsels' performance, absent the distorting effects of hindsight, fell within the wide range of reasonable assistance." Plante, 171 Vt. at 313. In addition, courts must remember that "trial of [a] case ... [is] susceptible to more than one strategy. The proper question is whether trial counsel had any reasonable strategy and whether they pursued it with adequate preparation and diligence." In re Dunbar, 162 Vt. 209, 213 (1994), quoted in Russo, 2010 VT 16, ¶ 16.

To meet the second prong of the ineffective assistance test, Muhammad must show that "counsel's deficient performance prejudiced the defense. A defendant proves prejudice by demonstrating 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Dunbar, 162 Vt. at 212 (citation omitted). The United States Supreme Court has defined a "reasonable probability" in this context as "a probability sufficient to undermine confidence in the outcome." Strickland V. Washington, 466 U.S. 668, 694 (1984). In considering an ineffective assistance claim, the court "must consider the totality of the evidence before the judge or jury," and decide whether "the decision reached would reasonably likely have been different absent the errors." Id. at 695-96.

In weighing these factors, the strength of the State's case is relevant. The weaker the State's case, the less it takes to show the likelihood of a different outcome. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696, quoted in Russo, 2010 VT 16, ¶ 18. In analyzing this aspect of the case, a court must "keep[] in mind that the legal standard for a criminal conviction is guilt beyond a

10

reasonable doubt ─ and thus acquittal required only injecting such doubt." Russo, 2010 VT 16, ¶ 18.

The First Prong

As noted above, counsel has some leeway in choosing a trial strategy. As Muhammad's expert conceded, the overall strategy chosen by trial counsel here was a reasonable one: to point the finger at the girlfriend as the dealer, since the tape-recording of the sale (which would have reflected who said what) had been suppressed. The issue has to do not with the choice of strategy, but with its execution. Trial counsel had a reasonable strategy, but he did not "pursue[] it with adequate preparation and diligence." In re Dunbar, 162 Vt. 209, 213 (1994), quoted in Russo, 2010 VT 16, ¶ 16. First, it was reasonable to try to show that the girlfriend was the dealer, but counsel asked questions that he should have seen would risk opening the door to evidence about Muhammad's other drug involvement. The court credits Attorney Katims' opinion that any reasonably competent defense attorney would have seen the risk of asking questions about why the police were focusing on Muhammad and what other evidence they had.[1]

Second, trial counsel either had not done adequate discovery to obtain the DEA reports, had obtained them but not read them, or had read them but made a poor choice to ask questions of the officer about the focus of the police being on the girlfriend when there were reports about the other CI's information. Counsel either had not done adequate pretrial discovery or was acting without thinking through his questions. Either way, he

---

[1] The State argues that Muhammad pushed his counsel to ask some of the questions at issue. The court does not find that clearly established by the evidence. Attorney Brown merely testified that that *might* have been the case. Even if it were established, however, it is the attorney's job to decide what questions to ask of a witness, and attorneys often have to tell their clients "no" in such situations.

11

damned his client by pursuing the path he did. The court concludes that Muhammad has established that trial counsel's conduct fell below prevailing standards.

## The Second Prong

The parties disagree on the significance of the errors in this case, primarily because they have different interpretations of the strength of the State's case. Without the damaging testimony, the State's case turned almost entirely on the testimony of the CI. Although her entry into the house empty-handed and her return with drugs was corroborated by the police officer's testimony, there was no corroboration of her testimony that she got the drugs from Muhammad as opposed to his girlfriend. The CI's credibility was undercut by her cooperation in exchange for consideration by the State with regard to her own charges. It was also undercut by her testimony on cross-examination that she had said in her deposition that it was Laura Desautels who gave her the drugs. Although, as the State points out, on redirect she asserted that she was referring in the deposition to a different drug purchase, the jury could have found her testimony on cross more credible than on redirect.

Thus, without the damaging errors by defense counsel, the State's case would have rested almost exclusively on one witness whom the jury might have found to be unreliable. Once the jury learned that Muhammad had been charged with another drug transaction, that he had been reported by another CI to have been selling cocaine and heroin, that he was living in the residence with Desautels and the police had seen "short-duration traffic" to the house consistent with drug sales, and that he had been about to sell crack cocaine to an undercover police officer during which transaction he discussed the price and quantity of the drugs, his conviction was virtually certain.

The court concludes that but for all of this damaging testimony in response to defense counsel's door-opening questions, Muhammad had a chance of being acquitted. Russo, 2010 VT 16, ¶ 18 ("keeping in mind that the legal standard for a criminal conviction is guilt beyond a reasonable doubt – and thus acquittal required only injecting such doubt[.]"). The additional evidence took away any chance of acquittal. The court concludes that there is a reasonable probability that the jury would have acquitted absent the damning evidence.

Additional Issues Raised by Muhammad

Shortly before the PCR hearing counsel for Muhammad moved to withdraw. The court took up that motion at the start of the hearing. The issue between Muhammad and his attorney was not that Muhammad was unhappy with what his attorney was doing, but that he wished to assert additional issues the attorney did not feel he could assert. The court suggested that Muhammad could add any arguments he wished at the conclusion of the hearing and the court would consider those issues. With that, Muhammad agreed to go forward with Attorney Lipschutz as his counsel.

The additional issues raised by Muhammad were as follows. First, he argued that trial counsel should have moved to dismiss the entire case because of the exclusion of the electronic monitoring evidence. However, the record reflects that the attorney did, in fact, make such a motion. Exhibit 3, Printed Case pp. 17-19. Thus, there was no ineffective assistance on this issue.

Muhammad's second claim is that the deposition tape should have been admitted into evidence so that the jury could hear the CI giving inconsistent testimony. However, the fact that the deposition testimony was at least arguably inconsistent with the CI's trial

13

testimony was already before the jury. The choice of whether to make that point merely by cross-examining the witness or by playing the tape is the sort of strategy question that is within the discretion of counsel. It is not a basis for a finding of ineffective assistance.

Finally, Muhammad argues that counsel's pretrial preparation was inadequate, but the court does not understand what Muhammad claims was inadequate beyond whatever discovery issues are already addressed above.

Order

The court concludes that Muhammad has established his claim of ineffective assistance of counsel. Muhammad is directed to submit a proposed judgment within ten days, to which the State shall have five days to object.

Dated at Burlington this 28th day of April, 2010.

_____
Helen M. Toor
Superior Court Judge