VERMONT SUPERIOR COURT
Chittenden Unit
175 Main Street, PO Box 187
Burlington VT 05402
802-863-3467
www.vermontjudiciary.org

CIVIL DIVISION
Case No. 1051-11-17 Cncv

| Lumumba vs. State of Vermont |
| --- |

# DECISION ON PETITION FOR
# POST-CONVICTION RELIEF

Petitioner Yetha Lumumba seeks relief from two convictions—the first, after jury trial, on a charge of sexual assault and the second, on a plea deal, on an unrelated charge of lewd and lascivious conduct. The court heard evidence on January 25, 2022 and per V.R.C.P. 52(a)(1), invited proposed findings and conclusions. Both parties made submissions on February 8, 2022. Now having reviewed those submissions along with the evidence in the case, and on the findings and conclusions made below on a preponderance of the evidence, the court grants the petition with respect to the sexual assault conviction and denies it with respect to the lewd and lascivious conviction.

## FACTUAL BACKGROUND

Mr. Lumumba is a non-citizen who has resided legally in the United States since 2004. In September 2010, he was arraigned on charges of unlawful trespass and lewd and lascivious conduct in docket no. 3693-9-10 Cncr. He pleaded guilty to felony unlawful trespass and an amended charge of prohibited acts on April 1, 2011. Less than a week later, he was arraigned on charges of sexual assault and lewd and lascivious conduct in docket no. 1260-4-11 Cncr. Fearing immigration consequences, he then moved successfully to withdraw his plea in the earlier case.

Docket no. 1260-4-11 Cncv went to trial on March 7–9, 2012. Mr. Lumumba was represented by Shannon Dilley, a young associate in the law office of John St. Francis. Mr. St. Francis did not attend the trial, although given the seriousness of the charges and Ms. Dilley's lack of experience, he probably should have. At the conclusion of the trial, the jury returned a guilty verdict on the charge of sexual assault—no consent.

Mr. Lumumba claims that Ms. Dilley was ineffective in four respects. First, he argues that she failed to get into evidence Facebook messages that would have severely undermined the complaining witness's credibility. Second, he argues that she failed to exclude evidence of a UVM campus crime

Decision on Petition for Post-Conviction Relief
1051-11-17 Cncv Lumumba vs. State of Vermont

Page **1** of **8**

alert issued with respect to Mr. Lumumba in the fall after the events that gave rise to the charges. Third, he argues that she failed to object when the complaining witness speculated that Mr. Lumumba had broken into her apartment later that fall. Finally, he argues that Ms. Dilley agreed to a trial date without first checking with her expert witness, who then proved to be unavailable; this caused her to have to use another expert, without discovering before she put him on the stand that he had been disciplined for untruthful behavior. To compound matters, she then asked the second expert a question to which she evidently did not know the answer, and so got an answer that bolstered the complaining witness's credibility, in a case in which that credibility was the central issue. The court addresses the factual underpinning for each of these claims in turn.

With respect to the Facebook messages, Mr. Lumumba's and the State's experts agreed that the messages were highly exculpatory. In her deposition the complaining witness had acknowledged that there were Facebook messages between her and Mr. Lumumba, but it appears that Ms. Dilley did not ask about the content of those messages; nor did she attempt to authenticate them. At the trial, the State objected to their use, both on the basis of late disclosure and lack of authentication. The court indicated that the messages appeared to be an appropriate subject for cross-examination, "but the documents themselves will not come into evidence." During her cross-examination of the complaining witness, Ms. Dilley attempted unsuccessfully to use the messages to refresh recollection; again and again, with evidence of the messages in front of her, the witness denied recollection.

With respect to the campus crime alert, Ms. Dilley had moved in limine to preclude the admission of either the alert or a notice against trespass that had been issued to Mr. Lumumba after the events that gave rise to the charges but before the complaining witness reported those events. The State proposed to introduce both to give context to the timing of the complaining witness's coming forward. The court granted the motion with respect to the trespass notice, but granted it only in part with respect to the campus crime alert. With respect to that document, the court ruled that it could not come in, but the complaining witness could cite her awareness of a "campus alert"—with the word "crime" omitted—as part of the reason for her coming forward when she did. Ms. Dilley responded, "that's fine, your honor." Later, at trial, the complaining witness referred first to a "campus trespass notice" and later to a "campus alert" that resulted in Mr. Lumumba's "being trespassed off campus." The State's examination carefully avoided any mention of details of the alert.

In the same run of testimony, the prosecutor continued to discuss with the complaining witness her reasons for first telling someone what Mr. Lumumba had done several months earlier. The witness testified that she was "hoping for some way to keep [Mr. Lumumba] off campus" because she was

Decision on Petition for Post-Conviction Relief
1051-11-17 Cncv Lumumba vs. State of Vermont

Page **2** of **8**

"starting to get nervous because he was, you know, reaching out to my friends and trying to contact me." The prosecutor then asked if the witness had gone back to speak with the same officer a month or so later. The witness testified that she did, because her apartment had been broken into, and she speculated that it had been Mr. Lumumba who did it. This would have come as a complete surprise; in her deposition, the witness had testified that she did not think Mr. Lumumba was involved in the break-in. Nevertheless, Ms. Dilley failed to take any action.

Finally, with respect to the expert, Ms. Dilley gave notice to the State of her intention to call a Dr. David Mantell, to respond to expert testimony the State had disclosed "about how victims think/interact/freeze when confronted with an unwanted sexual encounter." At the pretrial conference, however, she had failed to determine Dr. Mantell's trial availability, and so agreed to a trial date on which he turned out to be unavailable. When the court declined to change the trial date, she then disclosed a Dr. William Nash. Before doing so or putting him on the stand, however, she failed to discover that he had previously been disciplined for lying under oath; at trial, the State successfully impeached him with that record. Also at trial, Ms. Dilley asked Dr. Nash a question for which she evidently had not prepared him, responding to the State's expert's testimony on piecemeal disclosure, and got an answer that was not altogether helpful; indeed, it may even have somewhat bolstered the complaining witness's testimony in a case in which her credibility was the central issue.

As noted above, at the conclusion of the trial, the jury returned a guilty verdict on the charge of sexual assault–no consent. This occurred only after several hours of deliberations. Along the way, the jury first asked to have some testimony played back. An hour later, they indicated that they were unable to reach a verdict. The court gave the standard hung jury instruction, and an hour after that, the jury returned a verdict.

The court sentenced Mr. Lumumba on July 2, 2012. At the sentencing hearing, Ms. Dilley presented testimony from Seth Lipschutz, an attorney in the Defender General's Prisoners' Rights Office. Mr. Lipschutz testified that he had done "an awful lot of criminal immigration-related work," with cases numbering "in the hundreds." When asked for his opinion as to the likelihood of Mr. Lumumba's being deported as a result of the sexual assault conviction, Mr. Lipschutz answered, "[i]n my opinion, it's guaranteed." Subsequently, the Supreme Court relied on this testimony in reversing Mr. Lumumba's sentence and remanding for resentencing. *State v. Lumumba*, 2014 VT 85, ¶¶ 18, 25, 197 Vt. 315.

In the meanwhile, with docket no. 3693-9-10 Cncr set for trial, Mr. Lumumba agreed to change his plea in that case. He pleaded guilty to both the unlawful trespass and lewd and lascivious charges.

While the basis for this decision does not appear in the record, the parties appear to agree that Mr. Lumumba acted on the strength of advice from Mr. St. Francis that because the sexual assault conviction alone made Mr. Lumumba deportable, a lewd and lascivious conviction would have no further adverse impact on his immigration status.

ANALYSIS

On these facts, Mr. Lumumba argues that he was denied effective assistance of counsel. The standard in this regard is familiar, articulated first in *Strickland v. Washington*, 466 U.S. 668 (1994). In order to prevail on an ineffective assistance of counsel claim, a PCR petitioner must "show by a preponderance of the evidence that defense counsel's performance fell below an objective standard of reasonableness informed by prevailing professional norms." *In re Fitzgerald*, 2020 VT 14 ¶ 31, 212 Vt. 135 (quotations omitted). "If this first burden is met, petitioner must further show that counsel's performance prejudiced the defense by demonstrating a reasonable probability that the result of the proceeding would have been different." *Id.*, ¶ 32 (quotations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotation omitted). Put another way, "a reasonable probability is a reasonable chance and not merely an abstract possibility." *In re Burke*, 2019 VT 28, ¶ 18, 210 Vt. 157 (quotation omitted).

Viewed through this lens, the court cannot conclude that Mr. Lumumba has shown that Ms. Dilley's performance with respect to the Facebook messages fell below an objective standard of reasonableness. While his expert opined that she should have been able to lock the complaining witness in on these messages at her deposition, that opinion is supported by nothing more than rank speculation. There simply is no reason to believe that Ms. Dilley would have been any more successful in deposition than she was at trial, where confronted with the messages, the complaining witness repeatedly denied any recollection. Moreover, while she was not able to get the messages themselves admitted, Ms. Dilley was nevertheless able to use them very effectively to undermine the witness's credibility—again, the central issue in the case. "Trial counsel are permitted a great deal of discretion in decisions regarding trial strategy, and even the failure of that strategy is not the standard by which a reviewing court will measure trial counsel's competence." *In re Dunbar*, 162 Vt. 209, 212 (1994). Accordingly, the court concludes that Ms. Dilley's performance with respect to the Facebook messages was well "within the range of competence" required by the standard of care. *See id.*

Equally, the court cannot conclude that Ms. Dilley's failure to persuade the court to exclude any mention whatsoever of the "campus crime alert" fell below an objective standard of reasonableness. Here, the State had shown that the alert was relevant to the complaining witness's state of mind in

Decision on Petition for Post-Conviction Relief
1051-11-17 Cncv Lumumba vs. State of Vermont

Page **4** of **8**

determining whether and when to come forward with her allegations. While it was also clearly prejudicial, in suggesting that Mr. Lumumba had engaged in a prior bad act, the trial court acted well within its discretion under V.R.E. 403 in allowing a very limited—and indeed somewhat sanitized—reference to the alert. While Mr. Lumumba's expert opined that Ms. Dilley should have "fought tooth and nail" to keep the alert out altogether, the record reflects that Ms. Dilley did indeed fight, and accepted the court's ruling only when it was apparent that it was the best she was going to get. At most, she could then be faulted for not having properly preserved the issue for appellate review. There is absolutely no reason to believe, however, that an appeal on this issue would have succeeded. In short, there is no evidence to support the assertion that had Ms. Dilley "fought tooth and nail," it would have made any difference.

The failure to take any action in response to the complaining witness's speculation that it had been Mr. Lumumba who burglarized her apartment is far more problematic. Here, both experts at the PCR trial agreed that Ms. Dilley's conduct fell below the standard of care; they agreed that she should have immediately sought a mistrial. The State's expert candidly admitted, "[t]hat was really bad." He later elaborated:

> Mr. Lumumba was charged with a very serious offense. He faced years in prison. The—the jury heard about this—this trespass order and campus alert, and then, out of the blue, the complainant testified that she suspected that he had burglarized her apartment after the alleged offense, and she was scared. Those are pretty scary facts.

He declined to opine on prejudice, testifying instead, "I would've argued for a mistrial and— and at this point, Judge Hoar is going to have to decide whether Judge Grearson would've granted it."

Fortunately, this court need not make that decision. Instead, the law requires the court to determine whether the probability that the trial court would have granted a mistrial or otherwise acted to remove the taint of the complaining witness's inflammatory speculation is "sufficient to undermine confidence in the outcome." Our Supreme Court has observed that in making such a determination, the court "must take into account all of the evidence before the jury." *In re Towne*, 2013 VT 90, ¶ 9, 195 Vt. 42. "The relative strength of a particular case has clear import in analyzing the reasonable probability of a different outcome." *Id.* ¶ 18. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *In re Sharrow*, 2017 VT 69, ¶ 11, 205 Vt. 309.

Here, both experts agreed that this was a weak case. That being so, it takes little to persuade the court that an error as glaring as Ms. Dilley's failure to do anything in response to the complaining

witness's burglary speculation substantially undermines faith in the outcome. *See In re Russo*, 2010 VT 16, ¶ 18, 187 Vt. 367 (affirming grant of PCR petition because of "insubstantial nature of the evidence that the State put forth at trial"). This conclusion is buttressed by the observation that moments before, the complaining witness had talked about "the campus trespass notice" that resulted in Mr. Lumumba's being "trespassed off campus," then testified that part of her reason for making her initial report was "concern[] . . . about anybody else's safety." While this testimony may not have crossed the line drawn earlier by the court in its ruling on admissibility of the "campus crime alert," it nevertheless created an atmosphere in which the witness's subsequent speculation of burglary was particularly inflammatory. In this context, taking into account all of the evidence, there is at least a "reasonable chance"—and well more than an "abstract possibility"—that the trial court would have granted a mistrial.

Penultimately, with respect to the alleged errors in presentation of expert testimony, the court concludes that Ms. Dilley's performance—in failing to ascertain her expert's availability for prospective trial dates, failing then fully to vet her substitute expert, and then asking him a question to which she did not know the answer—"fell below an objective standard of reasonableness." Both experts at the PCR trial agreed on the first of these, and the court credits Mr. Lumumba's expert's testimony on the second two points (on which the State's expert offered no opinions). Indeed, the maxim, "never ask a question to which you don't know the answer," is drilled into every aspiring trial lawyer—and applies doubly when, as here, the attorney has the opportunity to prepare the witness. The court cannot conclude, however, that these errors, taken alone, substantially undermine faith in the outcome of the trial. There is no evidence from which the court can determine the substance of Dr. Mantell's testimony, much less the weight the jury might have attached to that evidence. There is, of course, at least a colorable argument that in a case that evidently was decided on such a delicate balance, even the slightest impact could have tipped the scale. The court need not engage in this speculation, however, because of its conclusion that Ms. Dilley's error with respect to the burglary speculation was sufficient, standing alone, to undermine faith in the outcome of the trial.

Finally, the court cannot conclude that Mr. St. Francis's conduct in advising Mr. Lumumba regarding immigration consequences before entering his change of plea in the lewd and lascivious conduct case fell below the standard of care. Mr. Lumumba asserts that before giving this advice, Mr. St. Francis did not call the Prisoners' Rights Office. Had he done so, Mr. Lumumba asserts, Mr. St. Francis would have learned that the sexual assault conviction, standing alone, would not make Mr. Lumumba deportable, while adding a lewd and lascivious conviction to the mix would.

The court rejects this argument for three reasons, each of which alone is sufficient. First, there is no evidence that Mr. St. Francis did not make such a call. Second, the evidence does not support the conclusion that it would have been a violation of the standard of care not to have made such a call. Rather, it is a fair inference that Mr. St. Francis was aware of Mr. Lipschutz's testimony. In the face of that testimony, the court cannot conclude that it would have been a mistake not to call Mr. Lipschutz's office to confirm his opinion. Third, the evidence as to what Mr. St. Francis would have learned is speculative.

In this regard, the court cannot credit the opinion of Mr. Lumumba's expert that had Mr. St. Francis called the Prisoners' Rights Office, he would have been told that the sexual assault conviction, standing alone, would not make Mr. Lumumba deportable, while adding a lewd and lascivious conviction to the mix would. Mr. Lumumba's expert based his opinion in this regard entirely on a letter from Dawn Siebert, an attorney who was not in the Prisoners' Rights Office at the time. While Mr. Lumumba's expert can have based his opinion on this letter without offending V.R.E. 703, the determination of the weight accorded to that opinion remains solely the province of the finder of fact. Here, the court cannot credit the opinion, resting as it does on another opinion that is itself of questionable competence. Indeed, on cross, Mr. Lumumba's expert admitted candidly that he could not say that the advice set forth in Ms. Siebert's letter—written in 2021—is what the advice would have been in 2012. Recognizing that Ms. Siebert was not in the Defender General's Criminal Investigation Unit in 2012, he testified that Rebecca Turner would have been the person to call. He admitted, however, that he could not say what Ms. Turner would have said. Bluntly, this evidence falls well short of proving ineffective assistance of counsel. It is painting the lily to observe that there also was no evidence from which the court could conclude that armed with the advice in Ms. Siebert's letter, Mr. St. Francis would have been able to negotiate a more favorable plea.

These conclusions leave only the question of remedy. The court's conclusions with respect to the sexual assault conviction require that the court vacate that conviction be vacated and remand the case to the Criminal Division for further proceedings. Equally, the court's conclusions provide no basis for vacating the lewd and lascivious conviction. The court recognizes, however, that the decision to take a plea on that charge rested on the fact that Mr. Lumumba had already been convicted of sexual assault. The court notes also that before filing the sexual assault charges, the State's Attorney had agreed to a plea deal that involved amending the lewd and lascivious charge down to a charge of prohibited acts. It is not a flight of fancy to believe that such an outcome would be within the realm of possibility again, with the sexual assault conviction vacated. That possibility, however, does not afford a basis for post-

conviction relief. 13 V.S.A. § 7131 provides prisoners with the right to collaterally attack a sentence that "was imposed in violation of the constitution or laws of the United States." Post-conviction relief is a "limited remedy, intended to correct fundamental errors in the judicial process." *In re Burke*, 2019 VT 28, ¶ 16 (quotation omitted); *accord In re Grega*, 2003 VT 77, ¶ 6, 175 Vt. 631 (mem.).

Indeed, at the conclusion of the PCR trial, the court invited briefing on this question; the State accepted the invitation, while Mr. Lumumba declined. From this silence, the court infers acquiescence. Even without this inference, the court would be bound to conclude that with respect to the lewd and lascivious conviction, Mr. Lumumba has failed to demonstrate any "fundamental errors in the judicial process." Rather, his remedy would appear to lie, if at all, in the writ of *coram nobis*. *See State v. Sinclair*, 2012 VT 47, ¶ 16, 191 Vt. 489 ("[T]he common law remedy of coram nobis is a viable means for challenging criminal convictions. It may be used when no other remedy is available . . . ."). That writ, however, lies beyond the jurisdiction of the Civil Division, in a PCR case or otherwise. *See In re Garceau*, 124 Vt. 220, 221 (1964) ("the writ of coram nobis can issue only from the court which had jurisdiction in the first instance").

## ORDER

The court grants the petition in part and denies it in part. The court vacates the conviction in docket no. 1260-4-11 Cncr and remands the case to the Criminal Division for further proceedings. Pending such proceedings, the Criminal Division's pretrial "hold without bail" order remains in full force and effect. The conviction in docket no. 3693-9-10 Cncr stands, without prejudice to Mr. Lumumba's right, in the Criminal Division, to seek a writ of *coram nobis*.

Electronically signed pursuant to V.R.E.F. 9(d): 2/23/2022 4:09 PM

Samuel Hoar, Jr.
Superior Court Judge